Good morning, Your Honors. May it please the Court. Michael Roper and Frank Maury with the law firm of Bell and Roper on behalf of the appellants of Brevard County in this case. The primary issue, Your Honors, that is presented by this appeal is whether Brevard County, in the limited context of legislative prayer, can require that ceremonial invocations which are given at the beginning of the public meetings contain some theistic content and be theistic in nature as opposed to being atheistic or non-theistic and do so without violating the Legislative prayer occupies a unique position in the Supreme Court's jurisdiction that the court expressly recognizes that legislative prayer, while inherently religious, is compatible with the establishment clause and the practice of legislative prayer has co-existed with the principles of disestablishment and religious freedom. Importantly, I think, Your Honor, for this particular case, the Supreme Court has recognized several theistically connected purposes for legislative prayer and I think it's worthwhile reciting for the record those what those are. Number one, to request divine guidance for the legislative body. Two, acknowledgement of a belief in a higher power. Three, acknowledgement of the central place which religion and religious institutions hold in the life of those present. Respect for the divine and acknowledgement of religious leaders and the institution. I think, counsel, that the law is abundantly clear that in the area of legislative prayer it is historically rooted and it goes back an awfully long time. The question that I have goes to the methodology by which they proceeded in Brevard County, that is to say the commissioners, and my question is a specific one in that regard. I take it you would agree that the method of selection is an important part of the calculus? I think that the court's decisions have recommended it. We've said it. We've said it repeatedly. The Supreme Court said it and we said it in Cobb County, Palfrey v. Cobb County, as clear as you could say it. We looked at who the speakers were, we looked at how they were selected, and if we were required to, we might actually look at the prayer itself. But I want to ask you about the selection process. I take it you would agree that the county could not exclude religious groups simply because they didn't like them, didn't want them, didn't agree with them? Certainly, your honor. Isn't that what happened here? We don't believe it is, your honor. The reason I say it is the only codification we have is the 2015 resolution. It doesn't say much other than, one, the selection process is done on a rotation basis by the commissioners, and two, it says for a variety of reasons we're excluding atheists and secular humanists. That's what it says, but they basically otherwise incorporate the practice as it had evolved by custom and tradition in the county. When I looked at the depositions of the commissioners, it looked to me like some of them flatly barred religions because they just didn't want them. For example, they seem to bar, or some of them seem to bar polytheists. Can you do that? Where there's a belief in a supreme being, it just happens to be not monotheistic, but multiple. Let's say we're talking about Hindus or something like that, Sikhs. Can you just bar them? Your honor, the county would agree that that would not be appropriate. Forget whether it would be appropriate. Would it run afoul of the establishment clause if you did that? Yes, it would. Well, didn't you, didn't we have, let's say we looked at, they were asked about Rastafarians. It's a newer religion, but if you look at it, it is plainly monotheistic. It's an Abrahamic religion. By my count, we had a couple of them who said no or probably no, we wouldn't let them speak. Barfield says that. Fisher says probably no. Smith says no, but I'm not too familiar with it. How could you do that consistent with the establishment clause? Your honor, first of all, I would say that's not the case as presented at bar today. This is not a situation in which it's alleged that the county discriminated against a religion of that nature. The question... here is that unlike a number of the circumstances, let's say you took Palfrey v. Cobb County. We had unrefuted testimony from an administrator who said, this is what I did. I went to the phone book. I looked at congregations and I went, started at the top, went to the bottom, and invited them all. I didn't look at the nature of the organization that was listed, and they were invited. We said that was okay. There's nothing wrong with that process. But then there was also a process by which the planning commission in Cobb County proceeded, and the planning commission in Cobb County proceeded in a different way. The planning commission, the evidence was, at least the district court found, had certain religions with a line put through it. Muslims were out, Seventh-day Adventists were out, Jehovah's Witnesses were out, etc. And we said that runs afoul of the establishment clause. What we have here is basically no standards other than that the commission is on side, and some of them are more inclusive, some of them are less inclusive, and some of them have created bars for some religion. That seems to me to be the state of the record. Have I misunderstood that? I think, your honor, in contrast to the situation in Cobb County where there was a specific affirmative act to exclude certain religions, there is no record with respect to that in this particular case. In fact, the record in terms of who the speakers are that have been invited to provide presentations to the Brevard County Commission. I looked at the list. They're all monotheistic. I'm not saying you couldn't pick monotheistic. Don't misunderstand my question. The law is clear. If you had picked a single person, a single Presbyterian cleric, and you on the point. There was a single Presbyterian minister. He was paid a sum of money. He was salaried. He wasn't a full-time employee. And that necessarily excluded everybody else. And the Supreme Court of the United States said that's okay. So we're not questioning whether you can do that. We're simply questioning the process employed here. And when I looked at the depositions to find some meaning because there was nothing written other than the resolution in 2015 which told me that they rotated among the commissioners, that they re-upped, that was how they were doing it. And then I looked at the testimony. They struck people or said they would strike people and not consider them on account of the nature of the religion. And I think my response to that, from some of the individual commissioners. No, I think that's right. If you looked, for example, at Anderson, he had a very ecumenical approach and he was looking at all of them. But if you look at some of the others, let me put it to you this way. If you look at deists, by my count there are at least four who said they wouldn't invite a deist. By that account, Thomas Jefferson came back to life and walked in and said to the Brevard County folks, would you let me give an invocation? I'd love to do it. They would say no, you're a deist. Even though a deist has a belief in a supreme being, a monotheistic being, a singular creator, but basically says then there are natural laws that govern the operations of human endeavor. Deists are out. Does that run afoul of the establishment clause? Your Honor, I think in terms of, it'd be fair to say that perhaps the thoughts could have expressed more articulately in terms of the commissioners, in terms of how they responded to some of those questions. But I think what the testimony really shows that there was quite a bit of confusion amongst the commissioners as to the specific. Right, but you see the problem we have is we have, the only record we have of the selection process requires us to ask the commissioners. You'd prefer to have some written statement, here's what we do, and then you'd look at what they did do, and we would be far less impressed with you probing their mind, which is a very unattractive way to proceed. But it's all you have here. Although I don't know that the resolution also is particularly helpful to your cause in that respect. Well, Your Honor, I was going to suggest that what we have and what the Supreme Court has suggested that the court look at is how the invocation practice has been applied in the past. And there's absolutely no evidence in the record, other than with respect to the exclusion of atheists or non-theists, that the invocation practice has ever been practiced in Brevard County to exclude a theist. Well, how do The factual recitation in the town of Greece did include reference to the fact that the town of Greece had indicated that it would allow an atheist to provide an invocation. However, the court's opinion did not extend to requiring an atheist to be included. The court's opinion addressed in terms of individuals, either clergy or lay people, that would provide a prayer. And it's the county's position in the context of this legislative prayer that necessarily implies that it be a theistic prayer in nature. That being the case, is it still not the record here that three or four of the seven commissioners who were questioned put flat exclusions on some religions that they just wouldn't consider? They said no. When it comes to me and we rotate once a week, they're out. The polytheists are out. The Hindus are out. The deists are out. The Rastafarians are out. The Sikhs are out. Native American religion, they're out, some of them say. For example, some of them say, I don't know. I'd have to look further. I'd have to look harder into the nature of their religion because I just don't know enough about it. That might even be suggesting that there's a heightened kind of scrutiny for some religions and not others. I haven't said a word about atheists. I'm holding that issue aside for a moment, but I'm just asking, don't you have a problem with the selection process here because your they would bar some religions? Once again, your honor, in terms of the specific testimony of individual commissions, are you saying we can't consider that? Not saying you cannot consider it, your honor. I just don't think it's the most relevant. Well, then what else am I to look for? I don't have anything else other than the resolution in 15, which basically says atheists, you're out and secular humanists, you're out. Other than that, and they say, and here's how we do it. We rotate, but it doesn't tell me anything about what informs the selection process. And the commissioners who do the selection tell me they would keep A out or B or C or D. The record judge that is before the court is the way in which the invocation process has been applied in the past and the absence of any evidence that that has that invocation practice or policy has been in any way applied to exclude a theist. That's the record which really the court has in front of it. Has a deist or a Rastafarian or any of these other groups that commissioners said they would exclude ever been invited to give the invocation? Not that I'm aware of, and I don't believe that is in the record at all, your honor. What are we to take of, for example, Commissioner Smith was asked, point blank, would you allow a deist to give an invocation? Answer, no. Fisher, would you allow a deist to give an invocation? Answer, no. Barfield, would you allow a deist to give a prayer? Answer, no. Lewis, would you allow a deist? Answer, no. Second question, what about a polytheist? Would you allow any of them? Smith, no. Fisher, I don't know. Barfield, no. Lewis, I don't know. I would have to see what's presented. Native Americans, Anderson, certainly possible. Smith, I don't know. I'd have to see what they have to say. Fisher, not sure what a Native American shaman is. Barfield, I don't know. I'd have to think about it. I'd have to look further, and so on. Let's suppose the resolution they passed in 15 embodied just that, that it said four of the seven commissioners would keep out A, B, C, D, and E. Would that run afoul of the Establishment Clause? And, Your Honor, if I were, if we were here today. No, I just want an answer to that question. Would that run afoul of the Establishment Clause if it reflected what I just read to you? It would be improper for them to exclude other theistic religions. Okay, so if I were in front of you today on that type of a case, then I would admittedly concede we have a problem. The issue here is whether or not the county can properly differentiate within the context of legislative prayer between. You understand the thrust of my question is not asking whether you could discriminate between religion and irreligion. We'll get to that in a minute. My question is, can you discriminate between religions? Can you keep Buddhists out, Hindus out, Rastafarians out, Native Americans out, and Deists out, and still comply with the Establishment Clause? That's the problem I have with what this record reflects. At least that's the first problem. And I think I've answered that. I understand. No, you can't do that, Judge. Can I ask you about the injunction that was entered? I understand there was a permanent injunction and required you to allow humanists to give an invocation in the next 18 months. Was that injunction stayed, or is it operative? Your Honor, the injunction is in effect. Yeah, I couldn't see a stay in the record where anybody even requested a stay. So have you complied with the injunction? 18 months have passed. The county is observing a moment of silence in lieu of the invocation. So they haven't gone back to the district court saying, you're not complying with the injunction. But there's a stipulation on that point, Your Honor. Okay. So you're not selecting anyone now? No, Your Honor. Until this thing gets settled as a matter of law. You're saying a moment of silence. Nobody's doing anything other than a moment of silence. That's correct, Your Honor. I see. Okay. And I understand that you and probably the other judges want to move on, but I want to make sure I understand your position on the discrimination between religion's point. Are you saying that if there were an official policy that said we will not permit ABCDE, then that would be impermissible? But if individual commissioners, for whatever their own reasons, unofficially operate under that standard, that is acceptable? I don't say it's acceptable. I think that what is in the record is the confusion and the concern that some of the commissioners might have about the different religions. My point is that that has never manifested itself in a discriminatory way. How do you know that if all they've invited are monotheists? Your Honor, there's no record evidence that... Well, no, there's record evidence, though, that the decision makers say no, no, no, no, no, with respect to ABCDE. That's the record I have. But not with respect to... As I said before, Your Honor, if we were here before you on that type of a case, I would concede that we have a problem. But the issue is whether we can treat, for the purposes of this legislative prior issue, we can treat atheism and non-theism differently than theistic religions. Thanks, and you've reserved your full rebuttal time. Thank you, Your Honor. Your Honor, may it please the court, Alex Luchinitzer for the plaintiff's appellees. Your Honor, the county policy here violates a fundamental constitutional principle that government must not discriminate based on religion. Both the Supreme Court in Town of Greece versus Galloway and, as Judge Marcus described, this court in the Pelfrey case held that the establishment clause prohibits governmental bodies from discriminating based on religion in selecting speakers to deliver opening invocations. And the Supreme Court held in Procasso versus Watkins that humanism is a religion protected by the establishment clause's shield against religious discrimination. And this court held the same with respect to atheism in Glassroth versus Procasso. Do any of those cases involve this particular line of cases where we're dealing with invocations at the start of a legislative session? Those, Procasso and Glassroth, do not. But as Judge Grant mentioned, in Greece, the court acknowledged that an atheist could give an invocation. No, what the court acknowledged as a description of reality was that atheists were permitted. And that may have been wise. That was the state of the record that the Supreme Court had. The Supreme Court was not asked to decide that question. That sort of bolsters the argument about how what they did was constitutional. But nowhere does that case say that answer this particular question, whether you're obliged to provide that opportunity to an atheist, just that they did. I think that's a fair description of it. But the court did use the terminology that a non-believer could give an invocation and atheists could give an invocation, both the majority opinion and just... Let me ask you a question this way. The Supreme Court in Marsh talks about a long line of history, more than 200 years, suggesting, quote, in light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. It's a majority opinion. To invoke divine guidance on a public body entrusted with making the laws is not in these circumstances an establishment of religion or indeed a step toward the establishment of religion. It is simply a tolerable acknowledgement of beliefs widely held among the people of this country. As Justice Douglas observed, we are a religious people whose institutions presuppose a supreme being. The focal point, though, of Marsh was on invoking divine guidance on a public body entrusted with making law. Why couldn't they say that if you were going to speak, we'll let you speak, but just not at the invocation? Because whatever else you're doing, you're not seeking to invoke divine guidance. Your Honor, Marsh- Why can't they say that? Marsh didn't address the issue here. Marsh- No, it didn't. I agree with that. Marsh held that it's permissible to have theistic prayers. But Greece and Pelfrey hold that it's impermissible to discriminate based on religion. When you open up the opportunity to members of the public, you cannot discriminate based on religion. Our client's beliefs are religions. Humanism is a religion under Dracaso. And under Glasroth and Theriot of this circuit, atheism is also considered a religion. Justice Breyer- By whom? Where would I find proposition that atheism is a religion? Maybe soundly held beliefs, but where does that seek some supplication from a divine or otherworldly force or forces? Justice Breyer- Your Honor, humanists and atheists have a comprehensive belief system. Justice Breyer- There's a difference between an atheist and a secular humanist.  And four of the five- Justice Breyer- Secular humanist has a variety of belief systems that go beyond simply the rejection of a supreme being, right? Whereas atheism is simply, I reject the proposition that there's any divine force, divine being, whatever. Justice Breyer- And four of the five plaintiffs are secular humanists. There's only one who doesn't identify as a secular humanist and his- Justice Breyer- I understand that, but I'm just asking about an atheist. Why are you obliged to allow an atheist to give an invocation? It's not a religion, is it? Justice Breyer- Well, it is under this court's precedent- Justice Breyer- It's a belief system. Justice Breyer- It is under this court's precedent in Glasroth versus Moore, and under the Fifth Circuit pre-1981 decision of Theriault versus Silver. Both those cases recognize atheism and agnosticism as religions protected by the establishment of clauses prohibition against religious discrimination. And Mr.- I think you need to look at- I mean, for the one plaintiff who doesn't call himself a secular humanism, you have to look at his particular beliefs. And he believes that there's only- there's no divinity, there's only this life. And that, therefore, this life is what matters. And you need to live this life to its fullest. You need to treat people well, do the best you can for society. So his beliefs are actually very similar to the secular humanist beliefs of the other plaintiffs. If you look at his particular- I had a question for you, a factual question. During the relevant time frame, I think it was six years, there were more than 100 prayers given. Invocations, maybe 160 or something like that. Was there any claim in this record that any of those were- fell into the category of either proselytizing or denigrating a religion? I think a few of them did, but there was no pattern or practice of proselytization. We are not- Right. You're not making the claim that the prayer itself suggested a fatal flaw to it. It was proselytizing or denigrating. No, we're not. But Pelfrey says that even if the content of the prayers is acceptable, if the selection process is discriminatory, that by itself- No question. The holding is as clear as a bell. And we have a clearly discriminatory- But interestingly enough, what was knocked out in Pelfrey was an administrator who just put a red line through the yellow pages and said, Seventh-day Adventists are out, Mormons are out, Muslims are out, that kind of thing. That's what you had. There was no explication of the issue that you have here about secular humanists or atheists, right? Yeah, I mean, here you have- I didn't face this question. Yeah, here it's even- I argue it's even worse. Not only do you have a facially discriminatory policy that excludes secular humanists and atheists, the policy spans pages and pages delving into their beliefs, disapproving of their beliefs. So not only do you have expressed religious discrimination, you have entanglement here. You have a county that's getting into the details of particular religious beliefs, judging which ones it deems unacceptable and excluding those that it deems unacceptable. Is it your view that the county could never look at anything about the message to determine whether it is religious in nature? Suppose, for example, that a feminist group came along and said, We want to give an invocation. Our views on feminism are basic to our being and our identity. And we want to be heard. Could the commission say, Well, it just doesn't quite fit with what we're doing. You can be heard in the course of the meeting and make a public comment, but we're not going to let you give an invocation. One, could they do that? And two, could they make any determination about that without looking somehow behind the label to see what the group was about? Yes, they could exclude a feminist group. A feminist group is not a religious group. How do they know that without looking at what they believe? All I'm saying is you've got to make at least some preliminary look, don't you? Sure, that's right. But here, the plaintiffs in their initial demand letter, the plaintiffs explained that humanism is a minority religion. And there's case law that humanism is a religion. So once you have that, it's not proper to look further. Certain cases have recognized in certain contexts that Pastafarianism is a religion. Would the commission be able to bar Pastafarians from offering an invocation? Are you familiar with that? Yes, yes. As long as it's a genuine religion, they have to be allowed to present an invocation. If it's not a real religion, if it's a parody of a religion, which some people claim Pastafarianism is a parody, not a real religion, then possibly they could be excluded. But how do you make that determination without looking at the belief system of the group that lines up at the bar and says, I want to be heard? I don't think you can do, you can't judge. What you cannot do is judge whether the views are acceptable to you. That's easy. But that's not the question. Yeah, I mean, the question is, can you look at it in order to determine whether it falls in some general sense into the category of religious? I think you can look at sincerity. I mean, the case law says you can look at, you know, does this person believe that their beliefs are a religion? I mean, there's a case of this court called Watts versus Florida International University, 495 F3, 1289, 1297 to 99. And there the court says the key test is does the claimant himself consider his beliefs a religion? And here, all the plaintiffs do. They all testified in their declarations that they consider their humanistic and atheistic beliefs as a religion. You said there were some cases saying humanism is a religion. Can you just cite a couple of those? Sure, sure. For humanism, it's a Supreme Court case, Torcaso versus Watkins, 367 U.S., 488, and then 495, note 11. And then for atheism, it's Glasshouse versus Moore of this court, which is 335 F3, 1282, 1294 to 95. And then the pre-1981 Fifth Circuit decision, Theriault versus Thilber, 547 F2, 1279, 1281. If the county were to turn around tomorrow and say, this is costing us a lot of money. Lawyers are expensive. We want out of all this litigation. We're simply going to hire a cleric, and we're going to pay him $100 or $50, and he's going to give the prayer all the time. They could do that, couldn't they? That's, I think that's dicey. Why is that dicey? If it's based on a motive to exclude other belief systems? No, I said the motive was I didn't want to spend any more money on lawyers. That was my motive. If there's no motive, technically they could do it. It might run afoul of the judgment in this case, which the county agreed to the remedy. Because if under the judgment, if they start having opening invocations. Well, let's just assume hypothetically, we would have vacate the judgment on the and answered questions it didn't have to answer. Your Honor, let me just say the county. And follow my question. Okay, yes, your Honor. And said it violated the establishment clause because it discriminated between religious groups. On his face, it's clear. The county turns around and says, okay, we're going to do what? The Supreme Court said was okay in Nebraska. We're going to hire a cleric, pick the cleric you want, whatever. It's Presbyterian, he's Episcopalian, he's a Methodist, he's a Roman Catholic, he's a Jew, whatever, and we're going to pay him. And that's it. We're not going to, that's the end of it. Could they constitutionally do that in your view? I'll simply answer, yes, they could do it if it's not motivated by a desire to exclude non-theists or other religious minorities. And that's not what they've done. It's not this case. Once you open up the invocation opportunity to members of the public, then discrimination. I understand that. I'm just asking a different question. I'm asking whether they could do, in this case, what the legislature in Nebraska did in that case. Yes, if it's not motivated by an improper motive and if it doesn't run afoul of the agreed upon judgment we have, which allows each, which requires each plaintiff to be given an opportunity to deliver an invocation once within 15 months. Okay, then let me ask you a second question. Is there anything, let's assume the judgment was vacated, the injunction was struck down as overbroad by this court. Could they turn around and say, we're just going to the phone book, we're going to the yellow pages, and we're going online, and we're going to pick out congregations just the way they did in Palfrey v. Cobb County, and we're going to go from the first to the last. There are 236 of them there in the county or whatever the number may be. Could they do that? You know, I want to say yes, but if our plaintiffs' organizations are listed in the phone book under congregations and our plaintiffs' organizations are non-theistic religious organizations, they could not exclude them. So they're listed under congregations? Are they listed under congregations? I don't know, and maybe there's no record evidence. I don't know if they are. I mean, they're listed on the internet. I'm sorry? They're listed on the internet. I don't know if they're listed on the phone. So in the internet, you'd find them listed under, if they're listed on the internet, I went online and I typed in Brevard County religious organizations, religious institutions, religious congregations. Would I find the secular humanists? And is there any record evidence on that? Well, the record evidence is that on Facebook, Space Coast Freethought Association is listed as a church religious congregation. Okay. So the answer is some of them may be. That's correct. And they serve the same roles in their members' lives that a traditional theistic congregation serves in their members' lives. And the county, in fact, stipulated that the leaders of the organizational plaintiffs, which are four of the individual plaintiffs, serve the same roles for their organizations that a congregational leader of a traditional monotheistic congregation serves for their organization. I'm not suggesting, but by my question, they have to have one, but do they have like brick and mortar places like houses of worship? Do you generally do? I do not believe that they have brick and mortar. As opposed to they meet at someone's house or something like that? They meet, they often meet at some public place, but they find places to meet. There's not a, they do not, these particular organizations, I believe, do not have their own buildings at this point in time. I know you've disputed this point, but your opponents have said that the true goal of the plaintiffs here is to end legislative prayer, perhaps by offering offensive or nonsense prayers or things like that. Now, again, I know that you've disputed that. For the purposes of a hypothetical, though, if your clients or any other party gave the type of invocation that the county has suggested they fear, would that run afoul of Marsha's statement that the court doesn't look at the invocation so long as it's used not to disparage any other faith or belief? Yes, Your Honor. If our clients gave improper proselytizing or disparaging invocations, that would be improper, but our clients are not going to do that. They've sworn twice under penalty of perjury that they will not do that. And the county has, in fact, stipulated that the purpose of the plaintiffs in giving invocations, this is paragraph 110 of the stipulation, record number 83, that the reason they want to give invocations is to benefit the board, serve the community, and combat anti-atheist prejudice. Your Honor, I see my red light is on. Do you all have anything? You've been answering our questions. Was there anything else you wanted to add? We'll give you another minute to do it. I think you're, as Your Honor pointed out, there's, in addition to having a facially discriminatory policy here, and in addition to having a policy and practice that involves the county in improper entanglement and improper religious judgments and improperly prescribing the kind of prayer, you have voluminous evidence in the record of an improper purpose. And also in terms of the history question that Your Honor asked earlier, for a long time in this country, there were no Muslim invocations, no Buddhist invocation, no Hindu invocations, and no Sikh invocation. So if you look at what happened a long time ago in history to justify discrimination against humanists and atheists today, it would also justify discrimination against any non-Protestant religious minority. This is a discriminatory policy. It treats atheists and humanists as second-class citizens. It tells them to go back to the back of the bus into a public comment period. It's offensive to numerous constitutional clauses and the fundamental principles against religious discrimination at the heart of our Constitution. And it should be struck down, and the district court's opinion should be affirmed. Thank you, Your Honors. Final question. If we were to agree that what they did here violated the Establishment Clause, if for no other reason than they discriminated against Sikhs and whatever, Rastafarians, polytheists, Hindus, Buddhists, struck down the regime that they had in this case, do we have to address the First Amendment questions regarding speech or equal protection? You, if you affirm based on the Establishment Clause, you do not have to get into the other clauses. Thanks very much. Thank you, Your Honor. Mr. Roby, you've reserved five minutes and you'll have your full time. Thank you, Your Honor. Your Honor, with respect to the posture of the case, the county's position is that under the prevailing case law, because atheism or human secularism will not offer a prayer, and that's a way, a theistic prayer as it is understood and has been described by the Supreme Court, that they're not entitled to the protections under the Establishment Clause, that the county can, in fact, treat them differently than a person who would be offering a theistic invocation. But you would concede that you can't treat Buddhists, Sikhs, American Native religion, polytheists, Rastafarians different? Do I have that right? Yes, Your Honor. If all of those religions, and I will profess I'm not familiar with the Native American religion, but if all those religions recognize the divinity, recognize a higher power, and would invoke that blessing for the benefit of the Brevard County Commission, we could not do that. Why then would we even get to the question of whether they can or cannot keep, whether you can or cannot keep atheists out? Because they, I mean, if we were to conclude the whole regime here is tainted with violation of the Establishment Clause, you'd see what they do on round two. But why would we have to go any further? Well, Your Honor, as I said before, there's no record evidence before you that the county actually discriminated against any of those other religions that you have mentioned. The only evidence is that with respect to atheism, the county has chosen within its discretion and within the county acted through its commissioners and its commissioners had plenary authority on a rotating basis. That's the problem you have. The county didn't choose to come up with like a written description of its policies that bound all of them, except with respect to atheists and secular humanists. Then you put it down in writing. But with respect to the others, you left it basically standardless for the commissioner to decide when it was his turn. And then some of them said, we'd keep these folks out. And in fact, there's no record evidence that any of those folks were in. So one could draw some pretty clear inferences from that, couldn't one? Well, I think, Your Honor, the evidence is that there's no evidence in the record that any of those religions were excluded. That's never been contended. That wasn't a contention in this lawsuit at all. The question is whether or not atheists and secular humanists could be treated differently. Do you think that's the only question we have in front of us? I think that's the dispositive issue that you have in front of you, Your Honor, in terms of the fact that that evidence is not relevant to the question of whether or not the county can treat an atheist or a non-theist differently than it treats people who have a theistic belief, who believe in a higher power in the context of the Supreme Court decisions. I mean, essentially, the argument here, Judge, is that the appellees do not intend to use this opportunity to offer a prayer. In fact, they intend to use it to exercise their right not to pray. So it's outside of the confines of what the Supreme Court has recognized as the appropriate purpose for a ceremonial prayer, legislative prayer, prior to the commencement of the county's business. But doesn't paragraph 36 of the resolution actually categorize atheists and secular humanists as those who are pitted against monotheists? So doesn't that, although polytheists are not specifically named in that paragraph, doesn't that put atheists, agnostics, and other persons represented by or associated with FFRF and AUSCS as a group that has hostility toward monotheistic religions? I'm sorry, Your Honor. I was trying to read the resolution. Sure. So paragraph 36 addresses the hostility of the groups that I assume you'll agree are associated with the plaintiffs toward monotheistic religions. Doesn't that suggest at least an implied categorization of those groups together with polytheistic groups that would not be permitted to give invocations? I don't believe it does, Your Honor. I'm not aware of any expressed hostility that polytheists have towards monotheists. Isn't it implied here when you say hostility toward monotheistic religions and then you've got testimony from commissioners saying we wouldn't allow ABCDE polytheist invocations? The record does demonstrate the hostility of this particular group towards monotheists and theism in general, and so I think that's simply a reflection of what's already in the record. What do you say about the humanism cases he's citing? I mean, he's saying it's been recognized as a religion. You seem to say a religion has to have a monotheistic viewpoint. No, Your Honor, if I get that impression. You're just saying it's not a religion. Is that what you're saying? It's not a religion. First of all, Your Honor, I don't think the court has to reach that point to decide this case, but I don't think any of the cases recited by counsel for Applely are in this legislative prayer context. And what I am saying is that given the purposes for legislative prayer which have been recognized by the Supreme Court, you necessarily have to... Let's assume for sake of argument, humanism is a form of a religion, okay? Yes, Your Honor. So can you exclude them if it's a form of religion? I think to the extent that they do not believe in a higher power and would not seek divine intervention or divine blessing on the governmental body of the issue here, those are the factors that... Why is that not discriminating between religions? You just said you won't require them to be monotheist. That's correct, Your Honor, but... They don't have to be monotheist. So assume for sake of argument, humanism is a recognized religion. Do you still contend you can exclude them? Well, let me try that. Obviously, you still contend that. So let's say it another way. Let's assume they're a recognized religion, okay? Wouldn't it be discrimination between religions not to include them? I don't believe it would, Your Honor, because of the limited context legislative prayer exception which the Court has recognized and the purposes for... That you have to... You're saying the exception is you have to pray to a higher power of some sort. And that's... I don't think Buddhism does that. That's not me saying that. He's Buddha's enlightened person who... But there's not one higher power or several higher powers. I mean, so there'd be a lot of recognized religions that couldn't participate in the legislative prayer under your theory. Respectfully submit, Judge, it's not my theory. It's the Supreme Court's pronouncement in terms of what the acceptable purposes of legislative prayer and what it's intended to serve. Is it your understanding that the Supreme Court's recognition of legislative prayer is limited to monotheistic religions? So you would say that the Commission cannot distinguish between monotheistic and polytheistic religions, but they can between theistic and non-theistic religions? That's correct, Your Honor. Thanks very much. And thank you all for your efforts. It's an interesting case. This Court will be adjourned until 9 a.m. tomorrow morning. Thank you.